**2023 BNH 006**        Note:  **This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.**
_____

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 17-11760-BAH
                                                          Chapter 7
Steven T. Savage and
Virginia A. Savage,
                Debtors


Coastal Capital, LLC,
                Plaintiff
v.                                                        Adv. No. 21-1006-BAH

Steven T. Savage and
Virginia A. Savage,
                Defendants


*Peter Antonelli, Esq.*
*Curran Antonelli, LLP*
*Attorney for Plaintiff*


*James Kelly, Esq.*
*Kelly Law PLLC*
*Attorney for Defendants*


### <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

The Court held a two-day trial on March 13 and 16, 2023, on the remaining claims

asserted by Coastal Capital, LLC ("Coastal") in its complaint (Doc. No. 1) (the "Complaint")

against Steven T. Savage ("Steven") and Virginia A. Savage ("Virginia") (together the

"Savages" or the "Debtors"), seeking to deny the Debtors their discharges under 11 U.S.C. § 727

and to except Debtors' obligations to Coastal from discharge pursuant to 11 U.S.C. § 523.  The

Complaint contains six counts, titled as follows:

> Count I:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(2)(A) - Pre-Petition Transfer and Concealment of Property of the Debtor
>
> Count II:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A) - False Oath
>
> Count III:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(5) - Failure to Satisfactorily Explain Loss of Assets
>
> Count IV:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(7) - False Oath in Connection with the Sky-Skan Bankruptcy
>
> Count V:  Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4) - Fraud and/or Defalcation While Acting in a Fiduciary Capacity and Embezzlement
>
> Count VI:  Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6) - Malicious Injury

The Court issued orders on motions for summary judgment on May 18, 2022 (Doc. No. 109) and

on July 12, 2022 (Doc. No. 111).   Together, those orders (i) found in favor of Virginia with

respect to Coastal's claims against her in Count IV, and (ii) in favor of both Steven and Virginia

with respect to Coastal's claim in Count V that the debt at issue be excepted from discharge as

being a debt "for fraud or defalcation while acting in a fiduciary capacity" within the meaning of

§ 523(a)(4), but not with respect to Coastal's claim in Count V that the debt be excepted from

discharge as a debt "for … embezzlement."  Accordingly, the following claims remained for

trial:

> Count I:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(2)(A) - Pre-Petition Transfer and Concealment of Property of the Debtor
>
> Count II:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A) - False Oath
>
> Count III:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(5) - Failure to Satisfactorily Explain Loss of Assets

Count IV:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(7) - False Oath in Connection with the Sky-Skan Bankruptcy – as against Steven only

Count V:  Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4) - Fraud and/or Defalcation While Acting in a Fiduciary Capacity and Embezzlement – with respect to embezzlement only

Count VI:  Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6) - Malicious Injury

Despite the parties submitting lists indicating there might be as many as eighteen witnesses at trial, Coastal and the Debtors called only two witnesses, Steven and Virginia. At the conclusion of their testimony, the Court took the matter under advisement.[1]  The Court gave Coastal and the Debtors until May 19, 2023, and June 9, 2023, respectively, to file post-trial memoranda (Doc. No. 146), which they did (Doc. Nos. 156 and 157) (respectively, "Coastal's Brief" and the "Debtors' Brief").

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

The Court finds the following facts, some of which were established at trial and in the summary judgment record, and others of which the Court has taken judicial notice.  Sky-Skan Incorporated ("Sky-Skan") was a company that designed, installed, and maintained digital

---

[1]  At the close of Coastal's case and then again at the close of the Debtors' case, the Debtors made oral motions for judgment in their favor.  The Court declined to rule on those motions, instead deciding, under Federal Rule of Civil Procedure 52(c), made applicable by Federal Rule of Bankruptcy Procedure 7052, to render its judgment after the close of the evidence and after taking the Complaint under advisement. The Court sets forth its findings of fact and conclusions of law in this opinion and, to the extent necessary, will deny by separate order the Debtors' oral motions, as clarified by the Debtors' post-trial submissions (Doc. Nos. 148 and 149).

equipment used in planetariums across the globe.  Steven was the company's president and sole shareholder.  Virginia served as the company's vice president and bookkeeper.  In July 2011, Bank of America, N.A. ("BOA") and Sky-Skan executed a loan agreement pursuant to which BOA provided Sky-Skan with a $900,000.00 line of credit.  To secure the loan, BOA and Sky-Skan executed a security agreement which gave BOA a security interest in various categories of Sky-Skan's property, including all accounts, inventory, machinery, equipment, and cash or non-cash proceeds.  The Savages personally guaranteed that loan.  Steven's guaranty was secured by a mortgage on a commercial condominium in Nashua, New Hampshire that he owned individually, and in which Sky-Skan operated its business.  In April 2017, BOA assigned its loan and mortgage to Coastal.

During 2017, Sky-Skan was having financial difficulty.  The Debtors were funding much of Sky-Skan's business operations by using their own personal credit cards and debit cards.  Both Steven and Virginia testified that they used their own credit when Sky-Skan could no longer obtain credit, and that Sky-Skan reimbursed the Debtors for the business expenses that they charged to their personal credit and debit cards.[2]

Sky-Skan and the Savages ultimately defaulted on their obligations to Coastal.  Coastal filed a petition in state court seeking an order enjoining Sky-Skan and the Savages from moving, concealing, encumbering, wasting or altering the collateral securing their obligations.  Coastal sought an attachment and permission to conduct a secured party sale of the collateral securing its loan pursuant to the provisions of Article 9 of the Uniform Commercial Code as enacted in New Hampshire (NH RSA 382-A).  The state court issued orders in August and September 2017.  Specifically, on August 27, 2017, the state court found that Coastal "made a satisfactory

---

[2] At trial, the Savages supplied hundreds, if not thousands, of pages of documentation supporting these claims.

preliminary showing … that it is properly secured with respect to Collateral as described and defined in [its petition] and that immediate and irreparable injury, loss or damage will result if the requested relief is not granted." For that reason, the state court ordered that "Sky-Skan Incorporated, Steven T. Savage and Virginia Savage shall not move, conceal, encumber, waste and/or alter the Collateral." On September 22, 2017, the state court issued another order, which reiterated the same proscriptions that the court ordered on August 27, 2017: "Sky-Skan Incorporated, Steven T. Savage and Virginia Savage shall not move, conceal, encumber, waste and/or alter the Collateral." Further, Coastal was permitted to secure and/or move the collateral, take possession of all bank accounts, and conduct a secured party sale of its collateral.

On October 31, 2017, Sky-Skan received a wire deposit to its Provident Bank account from a customer in the amount of $180,000.00. The next day, on November 1, 2017, the following five events occurred: Coastal filed a motion in the state court for contempt and immediate injunctive relief; the state court granted Coastal's request that the court "[i]ssue an immediate temporary order directing the defendants and their counsel turn over all funds in the Provident Bank account and the receivable checks be delivered immediately to Plaintiff and that the Hillsborough County Sheriff be given authority to assist Plaintiff in gaining possession of such receivable checks"; $157,843.04 was deposited into Sky-Skan's account at Provident Bank; $146,355.00 was withdrawn from the Provident Bank account; and Sky-Skan filed a chapter 11 bankruptcy petition (the "Sky-Skan Bankruptcy"). The sequence of these events is unclear from the record.[3]

---

[3] Sky-Skan's property was also encumbered by several tax liens in favor of the Internal Revenue Service (the "IRS"). In the Sky-Skan Bankruptcy, the IRS and Coastal disputed and litigated the relative priority of their respective liens on Sky-Skan's property, as discussed below.

On November 6, 2017, the state court issued an order that noted that it had on November 1, 2017 "granted the requested immediate temporary order directing the defendants to turn over to the plaintiff funds in a Provident Bank account and receivable checks."  Neither the amount of the receivable checks nor the amount of the Provident Bank account was set forth in the November 1 or the November 6 orders.  The motion for contempt, however, referred to the following collateral having been refused to be turned over:

   (a)  Approximately $140,000 in a Provident Bank account; and
   (b)  Approximately $336,000 in receivable checks.

In the November 6, 2017, order the state court found that "based on the offers of proof, that the defendants did not comply with the plaintiff's request to take possession of collateral as provided by both the security agreement and this court's previous orders, they are in contempt."  The court ordered the Debtors to pay Coastal's fees and costs and doubled the fees "for the intentional contemptuous actions by the defendants."  It is unclear from the record what ultimately happened to the receivable checks that Coastal requested be turned over on November 1, 2017.

On November 27, 2017, Sky-Skan filed its statement of financial affairs ("SOFA") and schedules in the Sky-Skan Bankruptcy, which Steven signed under the pains and penalties of perjury.  Sky-Skan's schedules disclosed that it did not have any interest in any other business.  They also did not disclose any interests in licenses and intellectual property.  Sky-Skan's SOFA did disclose that Sky-Skan transferred $704,075.00 to the Savages for "Expense Reimbursement for use of credit cards, travel expenses, rent and repayment of personal loans" within one year before the filing of the Sky-Skan Bankruptcy.  At trial, the Debtors produced various records demonstrating that they received $574,247.71 from Sky-Skan to reimburse themselves for

charges incurred on their personal credit cards for Sky-Skan business expenses,[4] $10,851.71 to reimburse the Debtors for Sky-Skan travel and business expenses paid with their personal debit cards,[5] $89,500.00 for rent owed to Steven for Sky-Skan's use of the commercial condominium from which Sky-Skan operated (which property Steven owned individually),[6] and $10,000.00 to repay a loan made by Steven's father to the company.[7] Altogether the Debtors accounted for $684,599.42 of the $704,075.27 that Sky-Skan transferred to them between November 5, 2016, and November 1, 2017, leaving unaccounted $19,475.85.[8]

On November 30, 2017, Sky-Skan's 341 meeting of creditors was held. Steven testified at that meeting that Sky-Skan held no interest in Sky Skan Europe GmbH ("SSE") but that he personally held an ownership interest in SSE. On December 8, 2017, Sky-Skan amended its schedules to add additional assets and liabilities, including its interest in various trademarks and software.

On December 20, 2017, the Savages filed their own chapter 11 bankruptcy petition (the "Debtors' Bankruptcy"). On January 22, 2018, they filed their own schedules and statement of financial affairs. On their SOFA, the Debtors disclosed that they earned no income from employment or from operating a business during 2017 or during the two previous calendar years. Their SOFA reflected that they had received rental income of $89,500.00 in 2015, $84,250.00 in

---

[4] See Exs. 101, 106, 107, 107D, 107G, 107J, 107M, and 109-115.

[5] Ex. 122.

[6] Ex. 101.

[7] Ex. 101.

[8] The Court notes that this amount is different than the $117,411.48 figure that the Debtors cited in a previously filed motion in limine (Doc. No. 128), which figure Coastal adopted in Coastal's Brief as $117,000.00. This $117,000.00 figure for unaccounted monies is not supported by the trial record. See Ex. 101.

2016, and $84,750.00 in 2017.  Neither the SOFA nor the schedules reflected a figure of $704,075.27 as having been transferred by Sky-Skan to the Debtors between November 2016 and November 2017.[9]

On December 27, 2017, Sky-Skan amended its SOFA, disclosing that Sky-Skan owned 51% of SSE and 9% of Sky-Skan Oceana Pty, Ltd.  Steven signed this amendment under the pains and penalties of perjury.  On January 24, 2018, the Debtors appeared and testified under oath during the 341 meeting in the Debtors' Bankruptcy.  At that meeting, Steven testified that Sky-Skan owned 51% of the shares in SSE.

## III.  DISCUSSION

"Chapter 7 bankruptcy proceedings allow a debtor to obtain a 'fresh start' by discharging nearly all previously incurred debts."  Hernandez v. Shove (In re Shove), 83 F.4th 102, 106 (1st Cir. 2023) (citing Privitera v. Curran (In re Curran), 855 F.3d 19, 22 (1st Cir. 2017), and quoting Grogan v. Garner, 498 U.S. 279, 283 (1991)); see Botelho v. Buscone (In re Buscone), 61 F.4th 10, 20 (1st Cir. 2023).  "Nevertheless, the bankruptcy code 'limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor by exempting certain debts from discharge.'"  Shove, 83 F.4th at 106 (quoting Grogan, 498 U.S. at 279).  "When filing for bankruptcy, debtors are obligated to fully disclose the extent of their assets and debts … in such schedules."  Buscone, 61 F.4th at 20-21.  "The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction."  Boroff

---

[9]  The trial record reflects that the Debtors' schedules do indicate that they received $89,500.00 in rental income, which is part of the $704.075.27 figure that Sky-Skan listed on its SOFA as having been transferred to the Savages in the year preceding Sky-Skan's bankruptcy filing.

v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987).  "[T]he successful functioning of the bankruptcy code hinges both upon the bankrupt's veracity and [her] willingness to make full disclosure."  Buscone, 61 F.4th at 21 (quoting Marrama v. Citizens Bank of Mass. (In re Marrama), 430 F.3d 474, 482 (1st Cir. 2005), and Tully, 818 F.2d at 110).  "[T]he bankruptcy court is entitled to demand utmost good faith and honesty from debtors in the preparation of their schedules and statements of affairs."  Buscone, 61 F.4th at 21 (quoting Marrama, 430 F.3d at 482).  "Although the 'statutory right to a discharge should ordinarily be construed liberally in favor of a debtor,' this is not so when a claim 'falls squarely' into one of the § 727(a) enumerated exceptions."  Kupperstein v. Schall (In re Kupperstein), 61 F.4th 1, 7 (1st Cir. 2023) (quoting Tully, 818 F.2d at 110), and citing Premier Cap., LLC v. Crawford (In re Crawford), 841 F.3d 1, 7-8 (1st Cir. 2016)).  "[T]he ultimate decision about whether to grant or withhold a discharge is a mixed question of law and fact."  Gannett v. Carp (In re Carp), 340 F.3d 15, 25 (1st Cir. 2003) (quoted in Shove, 83 F.4th at 110).

### Count I:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(2)(A) – Pre-Petition Transfer and Concealment of Property of the Debtor

In Count I, Coastal seeks to deny the Debtors a discharge pursuant to § 727(a)(2)(A) of the Bankruptcy Code because "the Debtors knowingly and intentionally concealed and/or transferred their interest in property, including, but not limited to, the hundreds of thousands of dollars paid to them by Sky-Skan throughout 2017 in order to avoid their creditors, including Coastal."  Section 727(a)(2)(A) provides:

> The court shall grant the debtor a discharge, unless ... the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed [ ] property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A).  To be successful on a claim under § 727(a)(2)(A), Coastal must

establish by a preponderance of the evidence that:

1. the debtor transferred, removed, destroyed, mutilated, or concealed,
2. his or her property (or the property of the estate if the transfer occurs postpetition),
3. within one year of the petition filing date (for prepetition transfers),
4. with intent to hinder, delay or defraud a creditor.

Groman v. Watman (In re Watman), 301 F.3d 1, 7 (1st Cir. 2022) (cited in Watman v. Groman

(In re Watman), 458 F.3d 26, 32 (1st Cir. 2006)).

As the Court noted in its summary judgment order (Doc. No. 111) (the "Summary

Judgment Order"), for the Court to deny the Debtors a discharge under § 727(a)(2)(A), the Court

must find that the Debtors "transferred, removed, destroyed, mutilated, or concealed" the

Debtors' property, not Coastal's property or Sky-Skan's property.

It is undisputed that the Debtors received $704,075.27 from Sky-Skan in the year

preceding the Sky-Skan Bankruptcy.  The trial record demonstrates how the Debtors used some

of the $704,075.27 that Sky-Skan transferred to them within the year before Sky-Skan's

November 1, 2017, bankruptcy filing but not all of the money.  The Debtors presented evidence

regarding $684,599.42 of the $704,075.27 they received from Sky-Skan.  As described earlier,

Sky-Skan's SOFA disclosed that Sky-Skan transferred $704,075.00 to the Savages for "Expense

Reimbursement for use of credit cards, travel expenses, rent and repayment of personal loans"

within one year before filing the Sky-Skan Bankruptcy.  At trial, the Debtors produced various

records demonstrating that they received $574,247.71 from Sky-Skan to reimburse themselves

for charges incurred on their personal credit cards for Sky-Skan business expenses,[10] $10,851.71

to reimburse the Debtors for Sky-Skan travel and business expenses paid with their personal

---

[10]  See Exs. 101, 106, 107, 107D, 107G, 107J, 107M, and 109-115.

debit cards,[11] $89,500.00 for rent owed to Steven for Sky-Skan's use of the premises from which Sky-Skan operated,[12] and $10,000.00 to repay a loan made by Steven's father to the company.[13] As previously noted, the Debtors accounted for $684,599.42 of the $704,075.27 that Sky-Skan transferred to them, leaving unaccounted funds totaling $19,475.85.

The disposition of the $19,478.85 in funds is unknown.[14]  Steven testified that the money Sky-Skan transferred to the Debtors was to reimburse them for business expenses, specifically, he stated "we didn't take this money and do something with it.  What we did with it was pay business expenses and that's clearly outlined in those five journals."  Doc. No. 150 at 124. According to Steven, they used "all of this money to pay business expenses."  Id.  Virginia testified that "100 percent of the transfers here [from Sky-Skan to the Debtors] were for non-personal expenses."  Doc. No. 151 at 10.  "So everything that was listed that was transfers to us was either rent – for rent or to be used for business expenses. … Everything that Sky-Skan paid to us went through the accounting system either towards rent or business expenses."  Doc. No. 152 at 144.  She acknowledged at trial, however, that she "could not find all the records" that would have corroborated her testimony that all of the funds that Sky-Skan transferred to them were for rent or business expenses.  Doc. No. 151 at 13.

In the Court's view, if the unaccounted for $19,475.95 in funds were used to pay for Sky-Skan's business expenses, one would expect that backup documentation would exist in the same Sky-Skan records that corroborated $684,599.42 of the $704,075.27 in expenses.  Apparently

---

[11]  Ex. 122.

[12]  Ex. 101.

[13]  Ex. 101.

[14]  It seems plausible to the Court that the Debtor may have used these funds to live but they did not so testify at trial.

that backup documentation does not exist.  Without any credibly supported explanation as to the disposition of $19,475.85, it is reasonable for the Court to conclude that the funds were "transferred" or "removed" by the Debtors.  For that reason, the Court finds that Coastal has satisfied the first three requirements of its claim under § 727(a)(2)(A), i.e., that the Debtors transferred or removed their property (the funds that Sky-Skan transferred to them making them the Debtors' property), within one year of the Debtors' Bankruptcy.

However, to establish a claim under § 727(a)(2)(A), Coastal must prove a fourth element: intent, specifically, "intent to hinder, delay or defraud a creditor."  A debtor's subjective intent to delay or defraud a creditor is usually a fact-intensive inquiry.  Ghosh v. Bao (In re Tooley), Case No. 19-41928-CJP, AP No. 20-04023-CJP, 2022 WL 1038168, at *7 (Bankr. D. Mass. Mar. 31, 2022).  Debtors rarely admit to transferring assets to hinder, delay, or defraud creditors.  Id. at *7.  The Savages have not done so here, and the Court is unable to infer that intent from the trial record.  Coastal's Brief fails to address the issue of intent in its analysis of how the particular facts of this case fall within the provisions of § 727(a)(2)(A).  Instead, it merely cites a case where the Court found that the transfer of assets in violation of a state court order, while under financial distress, is a circumstance indicating fraudulent intent.  Marrama, 445 F.3d at 523.  This does not satisfy Coastal's burden.  Accordingly, the Court cannot deny the Debtors their discharges pursuant to § 727(a)(2)(A) and will enter judgment in favor of the Debtors on Count I.

### Count II:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A) – False Oath

In Count II, Coastal seeks to deny the Debtors a discharge pursuant § 727(a)(4)(A) in connection with their allegedly "false, inaccurate and/or misleading statements or omissions" in

their SOFA and their statement of current monthly income ("SCMI"), wherein "the Debtors concealed the hundreds of thousands of dollars in income that they received from Sky-Skan during 2017" and falsely stated "they received no income from operating a business in 2017 or the two (2) calendar years prior."  The First Circuit has stated that a debtor may be denied a discharge under § 727(a)(4)(A) if:

1. the debtor made a false statement under oath in the course of the debtor's bankruptcy proceeding;
2. the debtor did so knowingly and fraudulently; and
3. the false statement related to a material fact.

Zizza v. Harrington (In re Zizza), 875 F.3d 728, 732 (1st Cir. 2017) (citing Hannon v. ABCD Holdings, LLC (In re Hannon), 839 F.3d 63, 70 (1st Cir. 2016)).  With respect to the second element, "'reckless indifference to the truth' ... has consistently been treated as the functional equivalent of fraud for the purposes of § 727(a)(4)(A)."  Tully, 818 F.2d at 112 (quoted in Zizza, 875 F.3d at 732).  A false statement is material if it "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property."  Zizza, 875 F.3d at 732 (quoting Hannon, 839 F.3d at 75).  "[T]he threshold to materiality is fairly low."  Kupperstein, 61 F.4th at 9 (citing Crawford, 841 F.3d at 8, and quoting Lussier v. Sullivan (In re Sullivan), 455. B.R. 829, 839 (B.A.P. 1st Cir. 2011)).  "False oaths alone, however, are not enough to deny a discharge under 11 U.S.C. § 727(a)(4)(A). The falsehoods must be made 'knowingly and fraudulently.'"  Kupperstein, 61 F.4th at 8 (citing Crawford, 841 F.3d at 8, and quoting 11 U.S.C. § 727(a)(4)(A)).

The Debtors argue that Sky-Skan's transfers to them were not income, but rather expense reimbursements, and therefore the Debtors did not need to disclose the receipt of those funds on their bankruptcy schedules.  For that reason, the Debtors contend they did not make a false statement.

13

Income is a term defined broadly in the Bankruptcy Code.  Kupperstein, 61 F.4th at 8 (citing 11 U.S.C. § 101(10A), which defines "current monthly income" as the "average monthly income from all sources that the debtor receives … without regard to whether such income is taxable income").  As detailed above, the Debtors could account for only $684,599.42 of the $704,075.27 that Sky-Skan transferred to them between November 5, 2016, and November 1, 2017, leaving the disposition of $19,475.85 in funds unknown.

To the extent payments received from Sky-Skan exceeded the business expenses of Sky-Skan that were personally incurred by the Debtors and reimbursed by Sky-Skan, it seems those amounts should have been disclosed as income on the Debtor's SOFA and schedules.  To the extent that they were not so disclosed, the Court finds that the Debtors made a false statement under oath satisfying this element of Coastal's claim under § 727(a)(4)(A).  And because that false statement under oath related to the Debtors' finances, the statement related to a material fact, thus satisfying another element of Coastal's claim.

However, to deny debtors a discharge under § 727(a)(4)(A), the Court must find that they made the false statements "knowingly and fraudulently," i.e., with the requisite intent.  Coastal cites Irish Bank Resolution Corp. Ltd. v. Drumm (In re Drumm), 524 B.R. 329, 395 (Bankr. D. Mass. 2015), aff'd, Civil No. 15-CV-10184-LTS, 2015 WL 9911447 (D. Mass. Nov. 20, 2015), for the proposition that "fraudulent intent may be established by circumstantial evidence or inferred from a course of conduct."  But Coastal has not demonstrated how the particular facts of this case demonstrate the required intent with respect to its claim in Count II.  The Debtors' explanation for their actions is credible and does not support a finding that the Debtors were knowingly and fraudulently withholding information from their creditors or the Court.  The Debtors believe and testified that all the funds that Sky-Skan transferred to them were for rent or

business purposes, and thus, in their view, did not need to be disclosed.  The Court cannot make the inferential leap that Coastal has failed to lay out and establish.

Coastal has the burden of proving its case, including that the Debtors made a false statement with fraudulent intent.  The Court finds that it failed to establish all elements of its claim seeking to deny the Debtors their discharges under § 727(a)(4)(A).  For that reason, the Court finds in favor of the Debtors on Count II.

### Count III:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(5) – Failure to Satisfactorily Explain Loss of Assets

In Count III, Coastal seeks to deny the Debtors their discharges pursuant to § 727(a)(5) as the Debtors have allegedly failed to account for "hundreds of thousands of dollars" in money they received from Sky-Skan in the year before the Sky-Skan Bankruptcy.  Section 727(a)(5) provides that a debtor shall not receive a discharge if the debtor has "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  The First Circuit Court of Appeals has explained the requirements for denying a discharge under § 727(a)(5) as follows:

> Section 727(a)(5) authorizes the bankruptcy court to deny a discharge when a debtor has experienced a loss of assets or some other deficiency that the debtor cannot satisfactorily explain.

Harrington v. Simmons (In re Simmons), 810 F.3d 852, 860 (1st Cir. 2016) (citing Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005)).

> A burden-shifting framework applies:  if the party seeking to thwart a discharge shows that the debtor has not accounted for previously owned assets or previously earned income, the burden shifts to the debtor to explain the deficiency.  See id.  The debtor's explanation "must be supported by at least some corroboration," and it "must be sufficient to eliminate the need for any speculation as to what happened to all of the assets."  Id.  Something more than vague allusions is required.  See id.

To invoke § 727(a)(5), it is unnecessary to show that the debtor has acted fraudulently or in bad faith.  See id.  Rather, the issue turns on whether a satisfactory explanation is—or is not—forthcoming.

Simmons, 810 F.3d at 860 (citing Aoki), 323 B.R. at 817).  A "jumble of vague, unassorted memoranda, checks, bank statements, and bills," do not provide a satisfactory explanation for missing or lost assets.  Wortman v. Ridley (In re Ridley), 115 B.R. 731, 738 (Bankr. D. Mass. 1990) (quoting Jackson v. Menick, 271 F.2d 806, 809 (9th Cir. 1959)).  "In general, undocumented explanations will not be held satisfactory."  Ridley, 115 B.R at 738.

The Debtors provided documentary evidence regarding the disposition of $684,599.42 of the $704,075.27 they received from Sky-Skan.  The Debtors were unable to explain the disposition of the balance of $19,475.85, other than the Debtors testifying that all the funds that Sky-Skan transferred to them were either for rent or for business expenses that the Debtors personally incurred.

Further, as Coastal noted at trial, while the Debtors received $89,500.00 as rental income, the Debtors did explain where the entirety of that money went.  The trial record is clear that the Debtors did not use that rental income to make the monthly mortgage payments of $2,164.47 for the commercial condominium from May 2017 to November 2017, which amount totals $15,151.29.  In addition, for the months in which the Debtors did make the monthly mortgage payments on the rental property, the Debtors did not fully explain where the difference between the purported $8,000.00 monthly rental payment[15] and the monthly mortgage payment of $2,164.47 (or $5,835.53 per month) went during this period.  Steven testified that "[p]art of the

---

[15]  The Court notes that the amount of monthly rent Steven received varied from a low of $550.00 in January 2017 to a high of $18,200 in March 2017.  There were only two months during the period from November 2016 to November 2017 when Sky-Skan actually paid Steven $8,000.00 for rent; those months were April 2017 and July 2017.  In two months no rent was received, in five months the rent received was more than $8,000.00, and in four months the rent received was less than $8,000.00.

monthly rent was for rent and for salary" Doc. No. 150 at 164.  Virginia explained that Sky-Skan had been paying rent in the amount of about $4,000.00 per month at one time.  Then Sky-Skan ran into difficulty making tax payments to the IRS.  To lessen Sky-Skan's tax burden, Sky-Skan's accountant suggested that Steven and Virginia stop taking salary (which Viriginia estimated was more than $4,000.00 per month combined for them both at that time) and instead increase Sky-Skan's rental payment to Steven from $4,000.00 to $8,000.00 per month.  Doc. No. 152 at 147-48; see Doc. No. 151 at 12.  Virginia testified that "[w]e wanted [the salary] to be the minimum amount that we needed to cover our personal expenses."  Doc. No. 152 at 148.  Virginia testified that the rental income "was our main source of income at the time from – for the personal expenses."  Doc. No. 151 at 10.  She explained that this rental income "was our … only income personally and we had personal bills to pay as well."  Doc. No. 151 at 11.[16]

Based on the Debtors' testimony, it is appropriate to attribute $4,000.00 of each monthly rental payment as salary,[17] which the Debtors then used to pay for their personal expenses (e.g., home mortgage payment, utilities, food, vehicle expenses, etc.).  After attributing $4,000.00 per month as salary used for the Debtors' personal living expenses, there remains $1,835.53[18] per month in unaccounted-for funds.  Over a 12-month period, this would total $22,026.36.  Thus, by the Court's calculation, the Debtors' unaccounted funds total $56,653.50.[19]

---

[16]  Virginia reiterated that "the general purpose of raising the rent and lowering the salary [was to] reduce Sky-Skan's obligation for taxes."  Doc. No. 152 at 149.

[17]  Despite the Court attributing $4,000.00 to the Debtors as salary, the Court does not find that the Debtors made a false statement for purposes of Count II by failing to list this amount as income on their schedules, as the Debtors disclosed the rental income that they received at the higher $8,000.00 per month amount.

[18]  $8,000.00 - $2,164.47 - $4,000.00 = $1,835.53

[19]  $19,475.85 + $15,151.29 + $22,026.36 = $56,653.50

Unlike § 727(a)(2)(A) and (a)(4)(A), § 727(a)(5) does not require Coastal to establish that the Debtors acted fraudulently or in bad faith, but only that they have been unable to account for previously owned assets or earned income and have been unable to satisfactorily explain the deficiency. Because the Debtors have failed to satisfactorily explain what happened to $56,653.50 that they received from Sky-Skan, the Court must deny the Debtors a discharge pursuant to § 727(a)(5). See Patriot Grp., LLC v. Fustolo (In re Fustolo), 597 B.R. 1, 65-67 (Bankr. D. Mass. 2019) (holding the debtor's failure to explain where $29,981.00 out of total disbursements of $449,518.47 warranted denial of the debtor's discharge under § 727(a)(5) as "this amount of unaccounted for cash is not insubstantial under any definition"). Accordingly, the Court finds in favor of Coastal with respect to Count III.

### Count IV:  Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(7) – False Oath in Connection with the Sky-Skan Bankruptcy

In Count IV, Coastal sought to deny the Debtors their discharge pursuant to § 727(a)(7) based on Steven's statement[20] at Sky-Skan's 341 meeting that Steven was the 51% owner of SSE and his failure to disclose in Sky-Skan's bankruptcy schedules that Sky-Skan actually was the 51% owner of SSE.  Section 727(a)(7) provides that "[t]he court shall grant the debtor a discharge, unless … the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider."  Coastal is relying on § 727(a)(4)(A) in this count.  As noted previously, a debtor may be denied a discharge under § 727(a)(4)(A) if:

---

[20]  Because Coastal failed to allege that Virginia made any false statement, the Court granted summary judgment in favor of Virginia on May 18, 2022.  Doc. No. 109.

1.  the debtor made a false statement under oath in the course of the debtor's bankruptcy proceeding;

2.  the debtor did so knowingly and fraudulently; and

3.  the false statement related to a material fact.

Zizza, 875 F.3d at 732.

The Debtors do not dispute that Sky-Skan is an insider.  It is also undisputed that Sky-Skan amended Sch. A/B to reflect that Sky-Skan was the 51% owner of SSE and therefore Steven made a false statement under oath (Bk. No. 17-11540-BAH, Doc. No. 140).  It is also undisputed that at Sky-Skan's 341 meeting Steven testified that Sky-Skan had no interest in SSE, when in fact Sky-Skan was the 51% owner of SSE.  Steven's statements are material as they relate to an asset of Sky-Skan.[21]  Thus, the only issue is whether the false statements were made "knowingly and fraudulently."

The Debtors have argued that "Steven Savage made a mistake when he stated that he was the owner of the stock of Sky Skan Europe GmbH and upon realizing the mistake he caused Sky Skan Incorporated's bankruptcy schedules to reflect that fact that Sky Skan Incorporated owns the stock of Sky Skan Europe."  Steven's testimony at trial supported the Debtors' position that this false statement was merely a mistake caused by Steven's assumption that Glenn Smith had transferred 51% ownership from Sky-Skan to Steven.[22]

---

[21]  The Court takes judicial notice that the Debtor's interest in SSE sold for $205,000.00 in Sky-Skan's bankruptcy case (Bk. No. 17-11540-BAH, Doc. No. 909).

[22]  Steven testified that he stated at the 341 meeting that he personally owned SSE because, at that time, he thought he did.  "I thought I owned it based on the authority it gave to Glenn to make the transaction, which I assumed he did."  Doc. No. 150 at 158.  "I gave Glenn permission.  I have power of attorney to make that change and I thought he did."  Id. at 164.  "[T]he general scenario, as far as I understand, was I gave Glenn power of attorney to make two changes that he requested.  The first was to remove me as a managing director and there was a reason for that, a good one; and the second was to move me – to move Sky-Skan and swap the shares to me personally.  He performed the former, but did not perform the latter. … But I didn't know that.  I assumed he had done both."  Id. at 170; see also id. at 51.

The Court takes judicial notice of the affidavit of Glenn Smith that was filed at the summary judgment stage of this proceeding.  Doc. No. 103-1.  In that affidavit, Smith stated that "[a]t some time in approximately 2009 Steven Savage asked me to determine and prepare the documents necessary to transfer the ownership of 51 % of Sky Skan Europe stock from Sky Skan Incorporated to Steven Savage. … For some reason the transfer was never processed and Steven Savage and I had not followed up with each other on whether it was completed."

When Sky-Skan amended Sch. A/B, the amendment included an explanation that "Debtor believed these shares were owned by Steven Savage and the Debtor's 2014 audited financial statement reflected Mr. Savage's ownership.  It was not until Debtor requested the corporate record book from SSE that it was discovered that the shares were still owned by the Debtor and not by Mr. Savage."

These statements support a finding that Steven simply made a mistake when he made the false statements under oath in connection with the Sky-Skan Bankruptcy.  The "knowingly and fraudulently" element of a § 727(a)(4)(A) claim requires that a debtor have fraudulent intent. Coastal's Brief is completely devoid of any explanation as to how the particular facts that were established at trial demonstrate that Steven acted knowingly and fraudulently in connection with the false oaths contained in Sky-Skan's schedules and made at the 341 meeting.  Steven's testimony regarding the reason for the omissions or misstatements was credible.  Unlike the Drumm case, the Court does not find that Steven "adopted a 'strategy' with respect to truth-telling and full disclosure, a strategy that involved the initial deliberate withholding of required information and the later controlled release of that information, when and as it suited [the debtor's] purposes." Drumm, 524 B.R. at 396.  Rather, the record reflects that any omissions or misstatements were due to excusable inadvertence.  Accordingly, the Court will enter judgment

20

in favor of Steven with respect to Count IV as Coastal has failed to meet its burden of proof with respect to this claim.

### Count V:  Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4) – Fraud and/or Defalcation While Acting in a Fiduciary Capacity and Embezzlement

In Count V of the Complaint, Coastal seeks to except its debt from discharge pursuant to § 523(a)(4).  Unlike Coastal's claims under § 727, which focus on denying the Debtors a discharge, Count V and Count VI (discussed below) each seek a determination of the dischargeability of the debt owed by the Savages to Coastal.  While it is undisputed that the Debtors owe Coastal a sum of money based on the July 28, 2011, guaranty executed by each of the Debtors, the amount that is presently owed was not explicitly articulated in the Complaint nor was it established at trial.  And Coastal did not call any witnesses from Coastal who may have provided clarity on this issue.  Nonetheless, the Court can take judicial notice of Coastal's claim filed in the Debtors' Bankruptcy, which alleges that Coastal was owed $932,152.233 as of November 1, 2017.  POC 17.  The Court also takes judicial notice that Coastal has already received an interim distribution in the Sky-Skan case and may receive a final distribution at some future date.[23]

The Bankruptcy Code provides in § 523(a)(4) that:

A discharge under section 727 … of this title does not discharge an individual debtor from any debt … for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

---

[23]  In Coastal's Brief, Coastal cites a motion in the main bankruptcy case that was granted by the Court (Bk. No. 17-11140-BAH, Doc. No. 1063) and asserts that "Coastal subsequently received a distribution of $144,644.85 pursuant to a settlement of various claims with the SSI Chapter 7 Trustee in November 2021, including its claim in the SSI case.  Thus, Coastal was owed no less than $787,507.48 after receipt of its SSI distribution" (footnote omitted).  On December 17, 2021, the Court did approve an interim distribution that authorized $144,644.85 to be paid to Coastal (Bk. No. 17-11140-BAH, Doc. No. 1108).

11 U.S.C. § 523(a)(4).  Coastal originally sought to except its entire debt from discharge "for fraud or defalcation while acting in a fiduciary capacity" or for "embezzlement."  In the Summary Judgment Order, the Court ruled that Coastal had not established the Debtors were acting in a fiduciary capacity with respect to Coastal.[24]  For that reason, only Coastal's embezzlement claim remains.

Common law provides that embezzlement is "the fraudulent conversion of the property of another by one who is already in lawful possession of it."  Sherman v. Potapov (In re Sherman), 603 F.3d 11, 13 (1st Cir. 2010)  "[T]o amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent."  Id.  To be successful on a claim seeking to except a discharge for embezzlement under § 523(a)(4), Coastal must establish:

1. the relevant property was rightfully in the possession of a non-owner;
2. the non-owner appropriated the property for a use other than for which it was intended; and
3. the circumstances indicate fraud.

Amsol, Inc. v. Jaworski (In re Jaworski), 2004 BNH 005, 15 (citing TransAmerica Comm. Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991)).

To succeed on its embezzlement claim in Count V, Coastal must establish that the "relevant property" was rightfully in the possession of "a non-owner."  Coastal has not proven that any of the property at issue[25] was in the possession of a non-owner.  As the Court stated in

---

[24]  The argument in Coastal's Brief—that it "has amply established that, in this case, the Savages knowingly and impermissibly violated State Court orders requiring them to hold funds in trust for Plaintiff's benefit"—does not withstand scrutiny.  The Court previously ruled in the Summary Judgment Order that "[t]here is no express or technical trust here."  Doc. No. 111 at 17.  The Court cannot understand why Coastal nonetheless continues to argue that there was a trust relationship between the parties, within the scope of § 523(a)(4).

[25]  Coastal never clearly articulated at trial or in Coastal's Brief exactly what property was allegedly embezzled by the Debtors.  Sky-Skan owes Coastal money based on a loan agreement executed by Sky-Skan.  The Savages owe Coastal money based on a guaranty of that debt.  Coastal is apparently arguing that monies Sky-Skan did not turn over between August and November 2017, in accordance with various

the Summary Judgment Order, it is basic corporate law that corporations operate through their

officers.  See RSA 293-A:8.41.  The property was Sky-Skan's property at all times.  Coastal

simply had a lien on the property.[26]  Because the property was never Coastal's property, Coastal

has not established and cannot establish that any of the debt that the Debtors owe to Coastal

should be excepted from discharge under § 523(a)(4).  For that reason, the Court finds in favor of

the Debtors on Count V.

### Count VI:  Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6) - Malicious Injury

In Count VI, Coastal seeks to except the debt that the Debtors owe to it pursuant to §

523(a)(6), which provides:

> A discharge under section 727 … of this title does not discharge an individual debtor
> from any debt … for willful and malicious injury by the debtor to another entity or to the
> property of another entity.

To be successful on a claim under § 523(a)(6), Coastal must prove:

1. the creditor suffered an injury;
2. the injury was the result of the debtor's actions;
3. the debtor intended to cause the injury or there was a substantial certainty that the
   injury would occur; and

---

state court orders, were somehow embezzled by the Debtors, and that these funds are the "relevant
property" for purposes of its § 523(a)(4) claim.  The Court disagrees.  As discussed above, the funds
remained Sky-Skan's property even after the state court entered its orders, pending the ultimate
disposition of that property under the applicable provisions of UCC Article 9.  And once the Sky-Skan
chapter 11 commenced, those funds (as proceeds of accounts in which Coastal—and the IRS—claimed a
security interest) were subject to the preemptive provisions of §§ 361 and 363 of the Bankruptcy Code
with respect to their use.

[26]  The state court never held that the property was Coastal's, but only that it was collateral securing Sky-
Skan's and the Debtors' obligations.  The state court ordered on September 22, 2017, that Coastal could
proceed to secure and/or move the collateral, take possession of all bank accounts, and conduct a secured
party sale of the collateral pursuant to NH RSA 382-A:9-610.  It never stated that Coastal "owned" the
property, but rather that Coastal could take possession of the collateral.  In the Court's view, it was up to
Coastal to take affirmative steps to do that and, unless and until it sold or otherwise disposed of the
property, the property remained Sky-Skan's.  While Coastal may have asked Sky-Skan to turn over
various property (which appears disputed with respect to the events of October 31, 2017, and November
1, 2017), and the state found that the Debtors failed to do so, this does not amount to embezzlement.

4. the debtor had no just cause or excuse for the action resulting in injury.

Kirk v. Burrows (In re Burrows), 2017 BNH 002, 13 (citing B.B. v. Bradley (In re Bradley), 466

B.R. 582, 587 (B.A.P. 1st Cir. 2012) (quoting Hermosilla v. Hermosilla (In re Hermosilla), 430

B.R. 13, 22 (Bankr. D. Mass. 2010)); Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998)).

Upon the state court's consideration of Coastal's motion for contempt and immediate

injunctive relief, the state court, on November 1, 2017, did "direct[] the defendants and their

counsel [to] turn over all funds in the Provident Bank account and the receivable checks [to] be

delivered immediately to Plaintiff and [ordered] that the Hillsborough County Sheriff be given

authority to assist Plaintiff in gaining possession of such receivable checks."  On November 6,

2017, the state court found that "the defendants did not comply with the plaintiff's request to

take possession of collateral as provided by both the security agreement and this court's previous

orders."  For that reason, the state court held the Debtors in contempt.[27]  The court ordered the

Debtors to pay Coastal's fees and costs and doubled the fees "for the intentional contemptuous

actions by the defendants."  Based on these events, Coastal seeks to except the Debtors'

obligations to it from discharge under § 523(a)(6).

The first issue in a § 523(a)(6) claim is whether the creditor suffered an injury.  By

finding the Debtors in contempt it appears the state court found that Coastal was injured.  But the

extent of that injury is not clear from the state court order, nor is it clear from the trial record.

Coastal did not present any documentary or testimonial evidence as to the amount it was owed as

of the date of trial, or how and to what extent it may have been harmed as a result of the Debtors'

---

[27]  As of November 1, Sky-Skan was in chapter 11, and the automatic stay obviously prohibited Coastal from asserting its claim against Sky-Skan in the state court.

actions.[28]  As noted earlier, Coastal did not call any of its representatives to testify at trial,

forgoing the opportunity to adduce evidence concerning the extent of its claimed injury.  Further,

despite being raised as an issue in the Summary Judgment Order, Coastal did not present clear

evidence as to what ultimately happened to the collateral that Sky-Skan did not turn over in

accordance with the November 1, 2017, state court order.

In addition to these inadequacies, the Court finds that Coastal has not demonstrated that

the fourth element of its claim under § 523(a)(6) has been satisfied, i.e., whether the Debtors had

"no just cause or excuse" for failing to turn over Sky-Skan funds (funds which served as

collateral securing Coastal's debt).  The Debtors testified at trial that they were acting on the

advice of counsel with respect to monies that were not turned over to Coastal on October 31 and

November 1, 2017.[29] [30]  The Debtors argued further in the Debtors' Brief that Coastal was not

---

[28]  As noted earlier in footnote 23, Coastal contends in Coastal's Brief that it was owed no less than $787,507.48 after receipt of its distribution in the Sky-Skan Bankruptcy.

[29]  These funds included $14,000.00 that was transferred to Steven's personal account and two separate cash withdrawals of $5,100.00 and $8,300.00.  Doc. No. 152 at 166.  In addition, Sky-Skan wired $45,855.00 to "Jvckenwood [sic] USA Corporation" and $45,000.00 to Attorney Tamposi.  Doc. No. 151 at 25; Exs. 14 and 22.

[30]  When testifying about his compliance with the state court orders, Steven testified as follows:

> Q.  But despite that, you continued – you on behalf the company continued to pay out, you and [your] wife, the amounts that you saw fit [that] the company needed, regardless of what the order said, correct?
>
> A.  I guess, but we didn't do – let's just say we always consulted with our attorney about all the affairs of our situation.

Doc. No. 150 at 105-106.

He explained further with respect to the receivable checks that Sky-Skan was holding on October 31, 2017, that they were told not to turn them over:

> I found out from Ginger that [Mr. Gleicher] told us not to do anything with the checks, to hold the checks. … It was clear we're not doing anything with the checks and that made me confused. …

even the first position creditor regarding some of the funds in question.[31]  The Court already

noted in the Summary Judgment Order that once Sky-Skan filed its chapter 11 petition, all Sky-

Skan's property became part of Sky-Skan's bankruptcy estate and would be eligible for

distribution to Sky-Skan's creditors in accordance with the Bankruptcy Code.

Based on these factors, the Court finds that the Coastal has not established that the

Debtors did not have just cause and excuse for failing to turn over funds to Coastal.  For that

reason, the Court finds that Coastal has not met its burden of proving that any of its debt should

---

> Mr. Gleicher told her not to do anything with the checks. … We were waiting for permission for
> guidance, for direction and we got none.

Doc. No. 150 at 150-153.

Steven explained further that when money was transferred on November 1, 2017, "[t]here was
transactions that all authorized by Mr. Tamposi," who was Sky-Skan's and the Debtors' attorney at the
time.  Doc. No. 150 at 152.

Virginia testified with respect to payments that Sky-Skan made on November 1, 2017:

> Well, we had decided at that point to go ahead and file bankruptcy and Mr. Tamposi said we
> could go ahead and pay what we needed to pay.

Doc. No. 151 at 26.

She further explained that Sky-Skan did not turn over a $180,000.00 wire transfer to Mr. Gleicher at
Coastal because:

> Well, he had just come in and at that point it was our belief that the only thing he wanted to do
> was liquidate the company and they wanted to keep operating and that's when we decided to file
> bankruptcy.

Doc. No. 152 at 183.

[31]  The Court ruled in the Sky-Skan Bankruptcy that the IRS held first priority status with respect to all
accounts receivable identified in that proceeding with the exception of one $600.00 account (Piampiano v.
Coastal Capital, LLC (In re Sky-Skan Incorporated), Bk. No. 17-11540-BAH, Adv. No. 17-1080-BAH
(Bankr. D.N.H. Sept. 29, 2021), Doc. No. 222).  On December 17, 2021, the Court approved an interim
distribution with $417,952.24 being paid to the Internal Revenue Service and only $144,644.85 being
paid to Coastal (Bk. No. 17-11540-BAH, Doc. Nos. 1063 and 1108).

be excepted from discharge under § 523(a)(6).  The Court therefore finds in favor of the Debtors with respect to Count VI.

## IV.  CONCLUSION

For the reasons set forth in this opinion, the Court will enter a judgment ruling in favor of Coastal on Count III of the Complaint and in favor of the Debtors on Counts I, II, IV, V, and VI of the Complaint.  The Debtors' discharges will be denied pursuant to 11 U.S.C. § 727(a)(5). This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Concord, New Hampshire.


Date:  November 28, 2023                    /s/ Bruce A. Harwood
                                            Bruce A. Harwood
                                            Chief Bankruptcy Judge